MARKHAM et al. v. STATE INDUSTRIAL COMMISSION et al.

No. 12376—Opinion Filed Feb. 14, 1922.

(Syllabus.)

1. **Master and Servant — Workmen's Compensation—Modification of Awards.**

Upon its own motion or upon the application of any party in interest, on the ground of a change in conditions, the commission may at any time review any award and, on such review, may make an award ending, diminishing, or increasing the compensation previously awarded, subject to the maximum or minimum provided in this act, and shall state its conclusions of fact and rulings of law, and shall immediately send to the parties a copy of the award. No such review shall affect such award as regards any money already paid. Section 12, article 2, Session Laws of 1915.

2. **Same — Order Increasing Award — Sufficiency of Evidence.**

The evidence examined, and held, that it supports the order of the State Industrial Commission.

3. **Same—Slight Errors in Order—Correction on Appeal.**

When it is apparent that the order of the State Industrial Commission is correct, except on account of an oversight a party is not given a credit to which he is entitled or on account of an error in computation the amount of the award is incorrect, this court will correct such oversight or error, and with the corrections so made affirm the order.

Action to review order of the State Industrial Commission, making an additional award to L. A. Mulholland, as claimant under the Workmen's Compensation Act; J. H. Markham, Jr., respondent, and Commercial Underwriters, insurance carriers, as petitioners, bringing the action. Affirmed.

Chas. E. Bush, A. F. Moss, and L. G. Owen, for petitioners.

Rainey & Flynn, for respondents.

MILLER, J. This is an appeal from an order of the State Industrial Commission made on May 14, 1921, allowing L. A. Mulholland, as claimant, additional compensation over and above the compensation allowed said claimant under an order of the State Industrial Commission made July 28, 1917, and reviewing said order of 1917. From this order the petitioners, J. H. Markham, Jr., and Commercial Underwriters appeal. The State Industrial Commission and L. A. Mulholland appear here as respondents.

The order appealed from discloses the facts upon which the claimant bases his claim for the additional allowance, therefore we will set it out in full.

"Now on this 14th day of May, 1921, this cause coming on to be considered pursuant to a hearing held in the city of Tulsa, Okla., on the 8th day of February, 1921, before a member of the State Industrial Commission on the motion of the claimant to review the award and grant further compensation, at which hearing the claimant appeared in person and the respondent and insurance carrier was represented by their attorneys,

Bush, Moss, Owen & Graybill, and the commission, after examining the testimony taken at said hearing and the reports of the physicians who examined the claimant and all the records on file finds: That the claimant, while in the employ of the respondent and in the course of his employment, was injured on the 25th day of April, 1917, and that he returned to work on the 1st day of June, 1917, and that he is entitled to compensation commencing on the 9th day of May. 1917. at the rate of $10 per week for a period of three weeks and two days, being for a total sum of $33.33, and the commission further finds that the claimant was again disabled on the 24th day of May, 1918, as a result of the injury, and that he returned to work on the 24th day of August, 1918, and that he is entitled to compensation commencing on the 24th day of May, 1918, at the rate of $10 per week for a period of 13 weeks and one day, being for a total sum of $131.67, in addition to $33.33 heretofore paid under the award of July 28, 1917; and the commission further finds that the claimant was again disabled from work on the 1st day of January, 1919. as a result of the injury and that he is still disabled, and that he is entitled to compensation commencing on the 1st day of January, 1919, at the rate of $10 per week, continuing until the termination of disability, in addition to any compensation heretofore awarded.

"It Is Therefore Ordered: That within ten days from this date J. H. Markham, Jr., or the Commercial Underwriters pay to the claimant compensation computed from the 24th day of May, 1918, at the rate of $10 per week and continue said payments weekly for a period of 13 weeks and one day, or until the sum of $131.67 has been paid, in addition to $33.33 heretofore paid under the award of July 28, 1917.

"It Is Further Ordered: That within ten days from this date J. H. Markham, Jr., or the Commercial Underwriters pay to the claimant compensation commencing on the 1st day of January, 1919, at the rate of $10 per week and continue said payments weekly until the termination of disability in addition to any compensation heretofore awarded."

The petitioners set out six assignments of error. All of these except the last one are based on the claim of petitioners that there was not any evidence to support the order of the State Industrial Commission. In their brief they make the following statement:

"The petitioner has filed this appeal on the ground that the award is wholly unsupported by the evidence, and other reasons which will be hereinafter stated. It will not be contended that the award was against the weight of the evidence, but that there was no evidence whatever which warranted the commission in making an award of compensation.

"We understand that the findings of the commission as to questions of fact are conclusive where there is any evidence whatever to support the same, but, on the other hand, we believe the law to be well settled that if there is no evidence which supports the award, then the commission has exceeded its jurisdiction, and the award will be reversed. Herbert v. Lake Shore M. S. Ry. Co. (Mich.), 166 N. W. 923; Saunders et al. v. New England Collapsible Tube Co. et al. (Conn.), 110 Atl. 538; Lezala v. Industral Commission et al., Wojoiechowski et al., v. Lezala et al. (Wis.) 175 N. W. 87; Pacific Coast Casualty Co. et al. v. Pillsbury et al., Industrial Accident Commission (Cal.), 153 Pac. 24; In re Gorski, In re Golon (Mass.), 116 N. E. 811; In re Savage, In re Aetna Life Ins. Co. (Mass.), 110 N. E. 283; Reimers v. Proctor Publishing Co. (N. J.), 89 Atl. 931.

"Statement of Facts.

"The evidence introduced at the hearing before the commission disclosed that the claimant received an injury on April 25, 1917, when he was struck by some object, which fractured some of his ribs. It appears from the claimant's evidence that he went back to work on the 1st day of June, 1917, and that he worked until May 24th of the following year, 1918, and that the ailment that he had in May, 1918, for which compensation was allowed, was bladder and bowel trouble, and that from May, 1918, on, he was confined in bed for a period of about three weeks, on account of such ailment, and that he did not go to work again until September, 1918, and that he worked from September, 1918, to January 1, 1919, at which time he was so disabled from ataxia that he was unable to continue work, and has not been able to work since that time."

We do not agree with petitioners' contention that there is not any evidence upon which to base the findings and order of the State Industrial Commission. On the other hand, we think the evidence strongly supports the findings and order. In order to pass upon this question it will be necessary to review a part of the testimony. Dr. H. G. Crawford testified as follows:

"Q. Just state for the records the nature of his injury that he received April 25, 1917. A. When I saw him first, first aid had been rendered by another doctor and his side strapped around the back and some trusses on his back and side. He had not been covered with the plaster yet. He complained with inability to urinate, and I found that he could not. I waited about 36 hours after the injury for him to void it. but he could not. I catheterized him and had to keep it up two weeks. His bowels did not act until five days after the injury. I saw this man quite

a few times for about four or five weeks. He went to work again about five or six weeks after the injury. I next began treating him about six or eight months after he returned to work. He came to my office complaining with his bladder, and upon examination I noticed what we call ataxia—he could not walk straight and shut his eyes. With this condition I readily expected syphilis. I had a blood test made, which was negative. His symptoms became worse and the ataxia more marked, but I gave him specific treatment with three injections with '606,' and there was no improvement with his condition. He was under my care for three or four months, and during that time he was able to get around some, and he went back to his work. By having help he was able to draw his wages. I did not see him again until three or four months, and he came in again in a worse condition than before, and I treated him at intervals until 1919. His condition at that time was such that he could work very little, could do practically no work at all, and I could not do any more for him. I did not see him after that—I do not remember of having seen him at all until today. * * * Q. Now doctor, between the 25th of April and the 31st of December, 1918, his condition was due to the injury that he received, do you think? A. Well, I cannot help but think there is a connecting link there, for he gave history as being in perfect health up to the time of the injury, and I knew the family for several years prior to the injury, and it seems to me there must be a connecting link there. Q. At that time did he fully recover from the injury—did he at any time fully recover from the injury? A. He went to work five or six weeks after the injury, and all he complained of was a weakness—not feeling as strong as before. But at the time I figured that he would get his strength back and would be all right, and I was surprised as he came back to me several months later with the same trouble. Q. Now state for the records the condition you found him in today? A. His condition is one of ataxia today. He cannot walk without his crutches and cannot walk much with them. He is an invalid at the present time. Q. His condition is due, do you think, to that injury received April 25, 1917? A. I cannot say, only that I think there is a connecting link somewhere."

On cross-examination Dr. Crawford testified:

"Q. Doctor, what did you say was the matter with him April 25th? A. What did I say was the matter? Q. Yes. A. He was suffering then with fractured ribs. He was in a cast of adhesive plaster and bandages, and he showed some bruises not covered by the adhesives. His trouble was an injury due to having been struck by some object, or with some object. Q. Was there any evidence of ataxia? A. No, not to my knowl-

edge at that time. Q. What is ataxia? A. You cannot control your gait. Q. What causes that? A. Traumatism, excessive drinking, and the majority of cases is caused by syphilis."

Dr. Fred Y. Cronk testified:

"Q. Are you acquainted with L. A. Mulholland? A. I was introduced to him today. Q. Have you made an examination of this man lately? A. I made an examination today. Q. State for the records the condition you found this man in. A. This man, to look at him sitting, seems to be in very good health. To see him walking it is quite an exertion. He does so by the use of crutches and the assistance of someone to help balance. The gait is of the shuffling type, which we speak of as being due to ataxia. The upper part of the body, so far as I am able to make out, shows practically nothing abnormal. That is from the waist up. The examination of the spine seems to be regular; the hip motions are good, except that they are restricted by pains in the muscles. In other words, we feel that there is a little spasms of the muscles. The muscular parts of the thigh and legs show some little atrophy, although not more than we might expect from the disuse. The voluntary movements are carried out very well in the patient when he is in certain positions. But in attempting to get in or out of a car, get up steps, he cannot; he is unable to raise the feet or legs and the movements are jerky and exaggerated. The reflexes are exaggerated; at the knee there is a clonus. That would suggest some injury to the spine or, some condition in the spine. Sensation has been gone over by Dr. Dwyer. An X-ray examination by Dr. Stewart, which included from the fifth dorsal to the sacral spine, shows no abnormalities. Two plates were made anteriorly and posteriorly, and none of which we found there has been any signs of an old injury. Q. Are the X-rays always correct, doctor? A. Yes, sir; if properly made. Q. From this man's condition would you say that it was due to an injury that he might have received three or four years ago? A. From my examination today, I am not able to connect up his present condition with the injury. Q. Can you give any cause of his condition? A. I think that he has an inflammatory condition; that there is a condition which may be caused by severe infections, fevers, and the one which we consider syphilis. Q. Assuming that this man was strong and healthy on April 25, 1917; and he received an injury on that date and has never been completely recovered, would you say there is any connection between that injury and his present condition? A. If he has never completely recovered at any time, I would feel there might be some connection. * * * O. Can you connect it up in any way? A. There is a possibility of the injury being so severe as to cause a slight laceration of the substance of the cord with a pos-

sible hemorrhage. Q. Would it be unusual to have an injury as described to bring about a condition such as this? A. I do not think so, if the man has returned to work about a year and a half after the injury, that it would cause the present trouble. Q. Assuming that he has never entirely recovered from that injury and he worked at different times, would that bring it about? A. From the history I was able to obtain from him, he never entirely recovered from this condition. He tells me he was able to take up the duties of pumping, but he stumbled and fell a great many times. Most of the time he used a cane. Q. With that history, would there be some connection? A. With that history of the injury and not improving, there would be some connection with this condition."

Dr. J. E. Dwyer testified:

"Q. Are you a specialist? A. Yes, of mental and nervous diseases. Q. Have you had occasion to examine Mr. Mulholland? A. I started to examine him last evening in my office. He was later sent to the Tulsa Hospital, where we had a spinal fluid examination made. I concluded the examination in the hospital. Q. Now state for the records the result of your examination of this man. A. I examined Mr. Mulholland and found the man apparently in good health. The pupils of—the right pupil was sluggish to the light reaction, left pupil normal. The upper chest, that is the heart and lungs, apparently normal; blood pressure about 1/30 normal. Muscles of the face and neck normal; I found the muscle tone of the arms good; the sensory disturbances in the chest and abdomen, the patient was unable to distinguish clearly what we term temperature sensation. In placing the tube containing hot water at various portions of the chest and abdomen, the cold water the patient invariably called the tube containing the hot water, the cold water. The tactical sensation, using a sharp pointed instrument, at times he told me he did not know whether it was hot or cold. When lying on his back he had his eyes closed, and this sensation was just the same. Lying on his face he was not able to see what I was doing. I found he was still unable to distinguish between hot and cold, and tell me when I was using the pin or instrument. The muscles of the leg, both upper and lower, are somewhat flabby and wasted. The knee jerks are exaggerated. The convulsive twitching of the ankle was marked in both ankles. The toe reflex, what we term the babinski, was absent on the left great toe; on the right great toe, doubtful. The patient was unable to distinguish between hot and cold in the water in these tubes. And also unable to state whether or not the pin pricks were sharp or dull. The patient on his own statement says that he has had some difficulty both with rectum and bladder, alternating with reten-

tion and incondite. This applies especially to the bladder. He was unable to control the urinal flow. He stated that he has been catheterized a number of times. This was not necessary in the hospital last night. I have a report of the examination by Dr. Terrell of the cerebro spinal fluid. This report I received a short time ago, is negative. The Wasserman reaction for syphilis is negative. It was with difficulty that the man was able to get out of bed and walk across the floor. With the assistance of both crutches he was able to do so. The trunk of his body being thrown forward; the feet being thrown to the floor, and on his return from one side of the room from the other, there was a slight dragging of the right foot. The tremor in both hands were decidedly marked. With the eyes closed the patient was unable to place the point of the index finger on the nose. This was in both hands. The muscles of the leg are very rigid. He seems to have a little more use of the left than the right. Q. Assuming this man was injured April 25, 1917, by receiving a blow in the side, which with a possible fracture of the eighth, ninth, and tenth ribs, and that he was disabled for several weeks and has worked practically a year and a half at different times since that time, would you consider his condition now as due to that injury he received in 1917? A. Not absolutely; no, sir."

The testimony of claimant was, in substance: He was injured the 25th day of April, 1917. Went back to work on the 1st day of June, 1917. Kept going until May 24, 1918; from that time for three months he was unable to do anything; then worked again from September, 1918, until January 1, 1919. During the time beginning with the 24th day of May to the first of September, 1918, he was confined to his bed three weeks. He was working as a pumper in the oil field. Part of the time he was just a figure-head on the job, and part of the time he did all the work. He was not strong. With the assistance of his wife, who did about one-half of the work, he was able to keep going and hold the job. He had bladder and bowel trouble at the time he was sick from May 24, to September 1, 1918. His first trouble about the unsteadiness in his limbs was in November or December, 1917. Prior to his injury he had never had any trouble of that kind, but noticed this condition immediately following his injury in April, 1917. His original statement filed with the State Industrial Commission, July 19, 1917, shows the nature of his injury—"four ribs broken, left side; temporary paralysis of bowels."

The statement of Dr. H. G. Crawford filed with the State Industrial Commission on May 24, 1917, shows the following:

"Give an accurate description of the nature and extent of the injury.—seventh,

ninth and tenth ribs on left side broken, complicated by a slight paralysis of the bowels."

The petitioners in their brief lay stress on the testimony given by the doctors, and from which they quote the following excerpts:

Testimony of Dr. Crawford:

"Q. His condition is due, do you think, to any injury received April 25, 1917? A. I cannot say, only that I think there is a connecting link somewhere. * * * Q. You did not—you do not pretend to say that his present condition now is due to that injury received? A. No, I would not say that. I would not say that, but it looks as though there is a connecting link there somewhere on account of he being so healthy. * * * Q. Did you ever know a case where ataxia resulted in a person from injuries of this character? A. No, sir."

Testimony of Dr. Cronk:

"Q. From this man's condition, would you say that it was due to an injury that he might have received three or four years ago? A. From my examination today, I am not able to connect up his present condition with the injury. * * * Q. Assuming that this man was strong and healthy on April 25, 1917, and he received an injury on that date and has never been completely recovered, would you say there is any connection between that injury and his present condition? A. If he has never completely recovered at any time, I would feel there might be some connection. * * * Q. Then you think that an injury would not ? A. It may be possible, but it is not the rule so far as my knowledge goes. * * * Q. Can you connect it up in any way? A. There is a possibility of the injury being so severe as to cause a slight laceration of the substance of the cord with a possible hemorrhage. * * * Q. Assuming that he has never entirely recovered from that injury and he worked at different times, would that bring it about? A. From the history I was able to obtain from him, he never entirely recovered from this condition. He tells me he was able to take up the duties of pumping, but he stumbled and fell a great many times. Most of the time he used a cane. Q. With that history, would there be some connection? A. With that history of the injury and not improving, there would be some connection with this condition."

The petitioners complain that the last answer of Dr. Cronk was based upon an assumption that there was no improvement in the claimant's condition after he met with the injury April 25, 1917, and that the ataxia was affecting the claimant from the time of the original injury. This complaint is purely technical, for the preceding answer quoted discloses that Dr. Cronk understood that he never entirely recovered, but was able to take up the duties of pumping.

The petitioners cite Reimers v. Proctor Publishing Co. (N. J.) 89 Atl. 931, from which they quote:

"The accident happened October 4th. Decedent had a compound fracture of the skull. He was discharged October 30th as improved. He returned to the dispensary from time to time for dressing and redressing, was readmitted November 12th and discharged December 5th as improved. This was the hospital record. The attending surgeons at the hospital testified that decedent got well. On December 7th he was taken with headache and vomiting. The attending physician testified that he could not give the cause of death; that he could not state whether there was anything in the nature of the injuries to produce vomiting; that vomiting could be caused by compound fracture of the skull; that pressure on the brain would cause vomiting: or vomiting might come on from indiscretion in eating, or from several causes. Another surgeon who had charge of decedent at the hospital testified that his head had practically healed three or four weeks, as he guessed, prior to death; the witness saw him just at the point of dissolution, and says he could not give the cause of death, and did not think he could do so if he had been there sooner. The witness saw nothing particularly wrong about his head when he returned to the hospital, and gave the decedent directions when he was discharged from the hospital the second time to be prudent in his eating. He said it was possible that the vomiting might have been caused by indigestion, or by the injury to the head. He also testified that there was nothing about the boy's brain to indicate what the cause of death actually was. We think the furthest this testimony goes is to show a possibility that the death was due to the accident. Where the doctors refuse to state that death was caused by the accident, there is no basis for an inference to that effect by the court. The burden of proof is, in accordance with the ordinary rule, upon the petitioner. That the Legislature did not mean to shift it to the defendant in a case like the present is shown by the fact that in the very same paragraph (section 2, pl. 7) it expressly enacted that the burden of proof that injury or death was intentionally self-inflicted, or that intoxication was the natural and proximate cause of the injury shall be upon the employer. 'Expressio unius, exclusio alterius.'

"The judgment must be reversed, without costs, and the record remitted for a new trial."

This decision is based on section 1, chapter 95, of the Laws of New Jersey of 1911, which reads:

"When personal injury is caused to an employe by accident arising out of and in the course of his employment, of which the actual or lawfully imputed negligence of the employer is the natural and proximate cause,

he shall receive compensation therefor from his employer, provided the employe was himself not willfully negligent at the time of receiving such injury, and the question of whether the employe was willfully negligent shall be one of fact to be submitted to the jury, subject to the usual superintending powers of a court. to set aside a verdict rendered contrary to the evidence."

Petitioners cite In're Savage, decided by the Supreme Judicial Court of Massachusetts, reported in 110 N. E. 283, wherein the court held:

"Under the Workman's Compensation Act, it is not enough for plaintiff dependent to show a state of facts equally consistent with no right of compensation as with such right."

The statute of Massachusetts providing for appeals from an award of the Industrial Accident Board is contained in Acts of 1911, chapter 751, section 11:

"There shall be a right of appeal to the Supreme Judicial Court on questions of law, and the Industrial Accident Board may report questions of law to the Supreme Judicial Court for its determination."

They cite Saunders et al. v. New England Collapsible Tube Co. et al., 110 Atl. 538, decided by the Supreme Court of Errors of Connecticut June 10, 1920. The right of appeal under the Workmen's Compensation Act in Connecticut is provided for in section 27, Public Acts of 1913, which is as follows:

"At any time within ten days after entry of such finding and award by the commissioner either party may appeal therefrom to the superior court for the county in which the injury was sustained. The clerk of said court shall notify the adverse party of such appeal. No bond for prosecution shall be required on any such appeal unless property of the defendant is attached therein. Actions brought into the superior court under the provisions of this section shall be privileged in respect to their assignment for trial over all other actions except writs of habeas corpus and actions brought by or in behalf of the state, including informations on the relation of private individuals. No costs shall be taxed in favor of either party on any such appeal."

They also cite Lezala v. Industrial Commission et al. (Wis.) 175 N. W. 87, decided by the Supreme Court of Wisconsin December 2, 1919. The right of appeal from an order of the Industrial Commission of Wisconsin is provided for by subdivision 21 of section 2394, on page 1625, of Wisconsin Statutes of 1913, and reads as follows:

"Said commission, or any party aggrieved by a judgment entered upon the review of any order or award, may appeal therefrom within the time and in the manner provided for an appeal from the orders of the circuit court except that it shall not be necessary for said commission or any party to said action to execute, serve or file the undertaking required by section 3052 of the statutes in order to perfect such appeal; but all such appeals shall be placed on the calendar of the Supreme Court and brought to a hearing in the same manner as state causes on such calendar."

The petitioners cite Tucillo v. Ward Baking Company, 167 N. Y. Supp. 666, from which we quote the second paragraph of the syllabus:

"Under Workmen's Compensation Law, para. 3, subd. 8, providing that 'death when mentioned as a basis for the right to compensation means only death resulting from such injuries,' proof of injury, of an operation therefor, and that after apparent recovery from effects of operation and anaesthesia the servant died from a disease existing before the injury, is clearly insufficient to establish death resulting from the injury."

Not any of the cases cited by petitioner are based upon a statute like that of Oklahoma. Section 10. article 2, chapter 246, Session Laws of 1915, as amended by section 10, article 2, chapter 14, Session Laws of 1919, provides in part:

"* * * The decision of the commission shall be final as to all questions of fact and except as provided in section 13 of this article as to all questions of law."

Petitioners next rely on Associated Employers' Reciprocal et al. v. State Industrial Commission et al., 83 Okla. 73, 200 Pac. 862. They quote paragraphs 1 and 2 of the syllabus:

"By the provisions of section 10 of the Workmen's Compensation Law (chapter 14, Session Laws 1919) the decision of the State Industrial Commission is made final as to all questions of fact; but this is so only when there is some evidence to support such decision, and where there is absolutely no evidence to support such finding and decision, the same may be reviewed as a matter of law.

"In a proceeding before the State Industrial Commission, seeking compensation for an alleged injury, the burden of proof is upon the claimant to show by the evidence that the injury complained of was accidental and arose out of and in the course of his employment."

Nicholson, J., in the body of the opinion, says:

"It appears from this order that the award was made solely upon the report of the medical examination of Dr. W. P. Lipscomb,

there being no other evidence introduced. This report reads as follows: 'Oklahoma City, Oklahoma, December 10, 1920. State Industrial Commission, State Capitol, Oklahoma City, Gentlemen: Examination of John Kuhn, December 19, 1920. Ear, Right—Drum is slightly retracted and thickened. No other abnormality is found. Left—There is a large round perforation of the drum, with a small amount of mucopurulent discharge. There is total deafness in this ear. Nose—a little thickening and irregularity of septum. Mucous membrane in state of moderate catarrhal inflammation, with small amount of mucopurulent discharge. Throat—Tonsils are enlarged and diseased. Teeth—Are in very good condition. The loss of hearing in the left ear may improve to some extent when the infection in the middle ear is completely overcome, and the drum healed; however, this is uncertain. The loss of hearing and the perforation of the drum is due to infection of the middle ear. It is impossible to state whether this is due to disease or injury. W. P. Lipscomb, M. D.' "

Under said section 10, art. 2, chap. 14, Session Laws 1919, in all appeals from the Industrial Commission to this court the decision of the commission is final as to all questions of fact. If there is any evidence that will sustain the decision of the Industrial Commission, then the decision is binding upon this court. If there is not any evidence to sustain the decision, then the appeal presents a question of law. The question of law thus presented is. Can the decision of the Industrial Commission be upheld without any evidence to sustain it? This court will only go behind the decision of the Industrial Commission to ascertain whether or not there is any evidence reasonably tending to sustain such decision. We do not consider it necessary for this court to review the evidence in this class of cases as we have done in this case. But because in this case there was no affirmative statement of any witness to the effect that the present condition of the respondent was the result of his previous injury, we deem it advisable to show by an analysis of the evidence that it is not necessary that such affirmative evidence be given in order to sustain the decision of the Industrial Commission.

The record in this case does not substantiate the claim of the petitioners that there is not any evidence to support the order of the State Industrial Commission. Not any one of the doctors testifies positively that the injury was the cause of his present condition, and because the record lacks that positive statement, the petitioners say there is not any evidence to support the order.

From a medical standpoint, the diagnosis of a case may be made either by synthesis or by analysis and elimination. The first method is probably more frequently used than the second. When the first method fails to disclose the cause of the affliction, the second method may be called into use and serve the purpose as accurately as the first. At the time of the injury the first method was used. A physical examination disclosed a fracture of certain ribs. It is admitted that claimant was injured. The history of the case shows conclusively that he never fully recovered. At the inception it shows more than the fracture of the ribs. Dr. Crawford says in his report filed May 24, 1917, "It is complicated by a slight paralysis of the bowels." The doctors all admit that if he had never fully recovered from the injury, his present condition would indicate a connection with the injury. The evidence shows that he never did fully recover.

We will now consider the diagnosis by analysis and elimination. It is admitted that he is suffering from what is known as ataxia. On cross-examination Dr. Crawford was asked these questions and gave these answers:

"Q. What is ataxia? A. You cannot control your gait. Q. What causes that? A. Traumatism, excessive drinking, and the majority of cases is caused by syphilis."

This last statement is not contradicted by any physician who testified at this hearing, therefore under the evidence there are but three things that could produce ataxia.

Dr. Crawford gave the following testimony in reference to Mr. Mulholland:

"He went to work again about five or six weeks after the injury. I next began treating him about six or eight months after he returned to work. He came to my office complaining with his bladder and upon examination I noticed what we call ataxia—he could not walk straight and shut his eyes. With this condition I readily expected syphilis. I had a blood test made, which was negative."

Dr. Dwyer testified:

"I have a report of the examination by Dr. Terrell of the cerebro spinal fluid. This report I received a short time ago, is negative. The Wasserman reaction for syphilis is negative."

These two tests, one made by Dr. Crawford in the last part of 1917 or the first part of 1918, the other by Dr. Dwyer and Dr. Terrell at the time of this hearing, February, 1921, eliminate the possibility of his condition being the result of syphilis.

The next step in the analysis and elimination is to determine whether or not his con-

dition is the result of excessive drinking. Dr. Crawford testified as follows:

"Q. Now, doctor, between the 25th of April and the 31st of December, 1918, his condition was due to the injury that he received, do you think? A. Well, I cannot help but think there is a connecting link there, for he gave history as being in perfect health up to the time of the injury, and I knew the family for several years prior to the injury, and it seems to me there must be a connecting link there."

In Dr. Crawford's report to the State Industrial Commission filed May 24, 1917, he gives negative answers to each of the following questions:

"Has previous sickness or injury contributed to his disability? No.

"If so, to what extent? No.

"Is there evidence of syphilis? No.

"Alcoholism? No.

"Occupational disease? No.

"Hypochondriasis? No.

"Exaggeration?    No.

"Tubercular infection? No.

"Any infectious disease? No.

"Neurasthenia? No.

"Hysteria? No.

"Is there evidence of malingering? No."

With the knowledge Dr. Crawford had of the family for several years prior to the injury, and having examined the patient, observed his condition, he reported to the State Industrial Commission there was no evidence of alcoholism, and it is not even suggested that he ever used intoxicants. Therefore, we must eliminate the possibility of his condition being the result of excessive drinking.

Under the testimony of Dr. Crawford there remains but one thing that could be the cause of Mr. Mulholland's present condition. That is traumatism. Webster's International Dictionary defines traumatism as: "The morbid condition of the system due to a trauma." Trauma is defined as: "An injury or wound."

Dr. Cronk testifies:

"The reflexes are exaggerated; at the knee there is a clonus. That would suggest some injury to the spine or some condition in the spine. * * * There is a possibility of the injury being so severe as to cause a slight laceration of the substance of the cord with a possible hemorrhage."

This explains how the trauma could have been caused. During the process of time the trauma brought about traumatism. Under the facts disclosed in the record traumatism is the only thing that could have produced it. All other things that would cause it must be eliminated, for they did not exist in the claimant.

After analyzing the testimony, we are forced to the conclusion that it affirmatively and conclusively shows the injury sustained by L. A. Mulholland on April 25, 1917, produced the ataxia.

Petitioners' 6th specification of error is:

"It appears from the records of the commission covering the proceedings on such claim, that the claimant was paid the sum of $30 per month for June, July, and August, 1918, and the commission in making its findings failed to give the petitioner the benefit of such payment, and the commission otherwise failed to give the petitioner the benefit of the payments made to the claimant which are proper, and as a matter of law should be allowed, if the order of the commission is in anywise sustained."

The evidence discloses that claimant received $30 per month for the months of June, July, and August, 1918. Petitioners are entitled to a credit of $90, the sum so paid the claimant, and this should be deducted from the amount awarded.

The evidence shows that claimant was disabled from May 24, 1918, to September 1, 1918. This would make 14 weeks and one day, or the sum of $141.67. The order is made on the theory that claimant was disabled from May 24, 1918, to August 24, 1918, making a period of 13 weeks and one day. The order is erroneous in that it should have allowed 14 weeks and one day instead of 13 weeks and one day, and it will be so modified. The claimant will be entitled to interest at the rate of six per cent. per annum an each weekly allowance of $10 from the date it was due until paid.

With the modifications above specified, the order of the State Industrial Commission, made on the 14th day of May, 1921, is hereby affirmed.

All the Justices concur, except HARRISON, C. J., not participating.